IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FAYE ROBIN TOULAN,                    *

     Plaintiff,                           *

v.                                    *          Civil Action No. CCB-05-2254

DAP PRODUCTS INC.,                    *

     Defendant.                           *

*        *        *        *        *        *        *        *        *        *        *        *        *

**REPLY TO PLAINTIFF'S RESPONSE TO DAP PRODUCTS INC.'S
MOTION FOR SUMMARY JUDGMENT**

Defendant DAP Products Inc. ("DAP"), through undersigned counsel, respectfully submits this Reply to Plaintiff's Response in Opposition ("Opposition") to DAP's Motion for Summary Judgment. For the reasons discussed below, as well as those discussed in the Memorandum in Support of DAP's Motion for Summary Judgment ("Memorandum"), DAP's Motion for Summary Judgment ("Motion") should be granted.

## I.    INTRODUCTION

Despite Plaintiff's submission to the Court of almost forty pages of argument (including both Plaintiff's Opposition and her Affidavit which functions more like a memorandum than an affidavit) and hundreds of pages of exhibits, Plaintiff has failed to identify little more than her own factually unsupported, self-serving assertions and subjective opinions that she has been discriminated or retaliated against. Most striking is Plaintiff's refusal even to acknowledge much less challenge, the truly relevant and undisputed facts and the legal implications thereof. Thus, Plaintiff simply ignores the undisputed facts that in DAP's Lab: Caucasian American women missed more time than she did, but did not receive warnings; Caucasian American women with her same title were the highest paid associates with that job title; male associates were paid a lower

salary than Plaintiff; Caucasian American women were promoted and received salary increases; and male associates were demoted and had their salary decreased or did not receive a salary increase. Ultimately, Plaintiff's perception that she was discriminated and retaliated against and her personal dislikes regarding her job and her supervisor, no matter how strongly felt, are not and cannot be sufficient to satisfy her burden of persuasion that Defendant intentionally discriminated and retaliated against her. See Dachman v. Shalala, 46 F. Supp. 2d 419, 440 (D. Md. 1999) ("a subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief"); Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989); Gairola v. Virginia Dept. of General Servs., 753 F.2d 1281, 1288 (4th Cir. 1985). For these reasons, as well as those discussed in Defendant's Memorandum, Plaintiff cannot raise any genuine issue of material fact which could preclude judgment in favor of Defendant.

## II.   DISCUSSION

### A.   Plaintiff's Opposition Suffers From Significant Evidentiary Deficiencies

Plaintiff's Opposition relies heavily upon assertions contained in Plaintiff's Affidavit. *(Opposition at fn. 1 explaining that the facts are stated in Toulan's Affidavit.)* The Affidavit, however, is defective for a number of reasons. The Affidavit is affirmed by Plaintiff as being true and correct "to the best of [her] personal knowledge and belief." (Emphasis added.) In order to survive a properly supported motion for summary judgment, the non-moving party must set forth specific facts showing that there is a genuine issue at trial. These facts must be evidentiary facts which would be admissible a trial. Fed. R. Civ. P. 56(e); Malina v. Baltimore Gas and Electric Co., 18 F. Supp. 2d 596, 604 (D. Md. 1998). Affidavits relied upon to oppose summary judgment must be made on personal knowledge and affirmatively show that the affiant is competent to testify to the matters stated therein. See Fed. R. Civ. P. 56(e). Statements made upon "belief" are not evidence for purposes of summary judgment. See Malina, 18 F. Supp. 2d at 604 n. 4.

2

Plaintiff's Affidavit is rife with conclusory statements, hearsay, unsubstantiated opinions and other assertions which fail to demonstrate that they are based on personal knowledge.  All of this should be disregarded for purposes of summary judgment.  Fed. R. Civ. P. 56(e); <u>Evans v. Technologies Applications & Service Co.</u>, 80 F.3d 954, 962 (4th Cir. 1996) (noting that summary judgment affidavits must be based upon personal knowledge and cannot be conclusory or based upon hearsay).  For example, in paragraph 7 of her Affidavit, Plaintiff states: "[A]ll R&D chemists at a given level perform essentially the same tasks, which require the same skill, effort and responsibility."  There is no effort to provide any evidentiary support for this assertion.  Indeed, the irrefutable admissible evidence shows that there is no basis for this opinion.  Thus, this and other similarly conclusory assertions should not be considered.  Nor should the Court consider hearsay statements about what certain individuals told Plaintiff or other assertions about which Plaintiff has no personal knowledge.  *(E.g. Toulan Aff. at ¶¶ 18, 50 and 50.)*  <u>See</u> <u>Contracts Materials Processing, Inc. v. Kataleuna</u>, 164 F. Supp.2d 520, 527-533 (D. Md. 2001); <u>Metropolitan Life Ins. Co. v. Hall</u>, 9 F. Supp.2d 560, 561 n. 2 (D. Md. 1998).

Plaintiff's Opposition and Affidavit also fail in most instances to identify with any sort of particularity where within her voluminous exhibits she believes the support for a given assertion might be found.  This Court has held:

> [I]t is important to remember that it is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion.  The court must properly rely on the plaintiff to identify such facts, and is not required to independently comb the record to look for them.

<u>Malina</u>, 18 F. Supp.2d at 604.  Plaintiff prefers to leave the work to the Court in the hope that the Court will merely assume that somewhere in Plaintiff's voluminous exhibits there must be some "evidence" for the stated proposition.[1]

---

[1] As an example, Plaintiff cites frequently to "PLTF D," which is Mr. Nabar's 303-page deposition with its 19 exhibits, without any reference to a specific page.

Plaintiff also attempts to rely upon unauthenticated documents.  It is clear, however, that "unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993).  For example, in paragraph 8 of her Affidavit, Plaintiff cites reports which she printed (without DAP's permission) from the Lab's Product Vision database.  However, she never asked any of DAP's witnesses about these reports.  Thus, there is no evidence as to what the database or the reports themselves reflect.  As such, they are of little, if any, evidentiary value.

Ultimately, Plaintiff's unsupported assertions, opinions, personal dislikes and subjective beliefs as set forth in her Opposition fall far short of creating any genuine dispute of material fact that might preclude summary judgment as to any of her claims.  While it literally is not possible to correct all of the errors contained within Plaintiff's Opposition and Affidavit within the space allotted by the Local Rules, neither it is necessary to do so.  Plaintiff has failed to point to any evidence that could raise any genuine dispute about the material facts that entitle DAP to summary judgment.  Accordingly, the Court should grant DAP's motion in its entirety.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2510, 2511 (1986); Barwick v. Celotex Corp., 736 F.2d 946, 958-59 (4th Cir. 1984).

**B.** **Plaintiff has no Hostile Work Environment Claim**

Defendant explained in its Memorandum that Plaintiff could not sustain her hostile work environment claims because there is no evidence that she was subject to any harassment of any sort. (*Memorandum at 17-18.*)  However, other than citing the prima facie elements of a hostile work environment claim and stating in a conclusory fashion tat the evidence establishes a hostile work environment and harassment, Plaintiff has failed to address this issue.   In fact, Plaintiff acknowledges on page 14 of her Opposition that her allegations are really about disparate treatment.

Accordingly, the Court should dismiss Plaintiff's hostile work environment claims without further consideration.

**C.      Plaintiff has Failed to Adduce Evidence Upon Which She Can Sustain Her Disparate Treatment and Retaliation Claims**

The precise bases for Plaintiff's claims have never been made entirely clear.  Nonetheless, DAP addressed each of the five discrete incidents about which Plaintiff seemed to be complaining, explaining in detail why none is a sufficient basis upon which to sustain a discrimination or retaliation claim.  Not only does Plaintiff's Opposition fail to better define the precise bases of her claims, it also fails to respond to the factual and legal deficiencies discussed in DAP's Memorandum.  Indeed, the Opposition serves only to confuse the issues further by mentioning other disputes Plaintiff now has regarding how she has been treated by DAP.  (These will be discussed herein as well.)  What it does not do is create any genuine issue of material fact precluding summary judgment.

**1.      Reporting to Patel**

Chronologically, the first incident about which Plaintiff complains is being assigned to report to Mr. Patel, who at that time had the same title as Plaintiff.  DAP's Memorandum explained Mr. Nabar's rationale for the May 2004 reorganization, and his belief that the assignment of Plaintiff to work with Mr. Patel in research would be good for her professional development.  *(Memorandum at 6-7.)*  DAP further explained that Plaintiff cannot sustain a claim based upon this assignment because it did not constitute an adverse action and because there is no evidence that can support a conclusion that it was discriminatory in any way.  *(Memorandum at 22-24.)*  Plaintiff's Opposition fails to address either dispositive issue or to identify anything discriminatory about this assignment.  Rather, Plaintiff's discussion of this assignment focuses on her assertion that Mr. Nabar was somehow acting secretively when he placed Mr. Patel on probation for promotion and

that there was contradictory testimony on this subject. *(Opposition at 8-9 and 15.)* Plaintiff's contentions are irrelevant and not supported by any record evidence.

With regard to the secrecy issue, it is ironically the testimony adduced by Plaintiff that establishes that Mr. Patel's probationary status was well known in the Lab. Plaintiff asked Mr. Nabar about an email he sent to Mr. Hairston, Ms. Huang, Mr. Cahoon, Mr. Erickson, and Mr. Patel in August 2004 regarding supervisory responsibilities which referred to the addressees as "Sr. Chemist (Jay included)." This email was forwarded to all Lab associates, including Plaintiff. *(Deposition of Shree Nabar, attached hereto as Exhibit 10, at 249:2 – 251:17 and Ex. 12 thereto.)* Mr. Hairston and Mrs. Levine also testified that they were aware that Mr. Patel was in an acting Senior Chemist role. *(Deposition of Thomas Hairston, attached hereto as Exhibit 11, at 103:11-21 and 106:8 – 107:21; Deposition of Felicia Levine, attached hereto as Exhibit 12, at 164:1-6.)* It must also be remembered that at another time Ms. Levine was also put on probation prior to promotion to Senior Chemist. *(Levine Dep. (Ex. 12) at 42:11 – 43:1.)* Moreover, even if it were true that it was entirely secret, there is nothing inherently discriminatory about this.[2]

It appears that Plaintiff believes that the testimony on this issue was somehow contradictory. Mr. Nabar testified that he told Mr. Patel that he would function in the role of a Senior Chemist and that if he performed well he would eventually get the title and responsibility for it. *(Nabar Dep. (Ex. 10) at 51:9 – 52:13 and 170:12-20.)* Mr. Patel did not deny that he understood this to be the situation. In fact, Mr. Patel was never asked whether he understood that he would be functioning as a Senior Chemist prior to being promoted. Rather, the questioning cited by Plaintiff focused on whether he remembered Mr. Nabar using the terms "probation" or "grooming." *(Deposition of Jay*

---

[2] In her Affidavit, Plaintiff states that Ms. Uranga believed that Plaintiff's assignment to report to Mr. Patel was an act of retaliation. Ms. Uranga did not so testify. The discussions in her deposition of retaliation relate to Plaintiff's assignment to the plant. *(Deposition of Marcia Blais (Uranga), attached hereto as Exhibit 13, at 23:7-20 and Ex. 1 thereto at ¶ 7.)* Plaintiff does not claim that the assignment to report to Mr. Patel was retaliatory, which of course makes sense given that she had not made any complaints of discrimination prior to it. [Since the period relevant to this

*Patel, attached hereto as Exhibit 14, at 27:3-16.)*  Similarly, Mr. Nabar testified that he mentioned the idea of putting an employee on probation prior to promotion to the President of DAP, and Ms. Mayor or Ms. Bennett.  *(Nabar Dep. (Ex. 10) at 247:3 – 248:14.)*  Ms. Mayor was not asked whether Mr. Nabar had discussed this with her; nor was Ms. Bennett.[3]

In the end, there is not even a hint of anything discriminatory about Plaintiff being assigned to report to Mr. Patel.  This is particularly true given Plaintiff's testimony that it is not the fact that Mr. Patel was made a supervisor, but only that Plaintiff had to report to him when they had the same title.  *(Deposition of Raven Toulan, attached hereto as Exhibit 15, at 174:6-19.)*  Her subjective dislike of the assignment or Mr. Patel is not evidence of discrimination.  Accordingly, summary judgment should be granted in favor of DAP with respect to Plaintiff's reporting to Mr. Patel.

## 2.    <u>Attendance Warning</u>

As explained in DAP's Memorandum, Plaintiff received an Attendance Warning in mid-2004 after it was noted that in half of the year she had exceeded by almost twice DAP's annual personal leave guideline.  *(Memorandum at 9-10.)*[4]  Plaintiff does not deny in her Opposition that she missed the time.  Rather, she seems to claim that the Attendance Warning was unfair because: (i) she had doctors' notes for some of the absences; (ii) Mr. Nabar had not spoken with the administrative assistant who had given the summary of time missed or with Plaintiff's former direct supervisor, Mr. Hairston; and (iii) it was somehow inappropriate for Mr. Nabar (the Vice President of Technology) to issue a warning.  *(Opposition at 10 and 14-16.)*  None of these allegations impact

---

matter, Ms. Uranga's last name changed to Blais.  She is referred to herein as Ms. Uranga, but she is identified in her deposition as Ms. Blais.]

[3] It is irrelevant that there is no written policy regarding having an associate function in a more senior role prior to officially promoting them to that position.

[4] When all of Plaintiff's missed time was totaled Plaintiff had missed <u>95.25</u> hours (<u>almost 12 full days</u>) of work through June 2004.  *(Exhibit 12 to Toulan Dep. (Ex. 3).)*

upon whether the Attendance Warning was in any way discriminatory.[5]  With regard to (i) and as was explained to Plaintiff at the time of the Warning and throughout this matter, doctors' notes did not lessen the need for the Attendance Warning because the issue was not why she had missed time from work, but that she had missed the time.  *(Deposition of Linda Bennett, attached hereto as Exhibit 16, at 18:7 – 19:6, 31:15 – 32:14 and Exs. 2 and 3 thereto; Nabar Dep. (Ex. 10) at 91:7-15.)*  With respect to (ii) and (iii), there is simply nothing improper about Mr. Nabar's having issued the Warning under the circumstances.  He was, after all, her second-level supervisor *(Deposition of Rita Mayor, attached hereto as Exhibit 17, at 185:16 – 186:13)*, and there is no indication that Mr. Hairston, who at the time had ceased to be Plaintiff's direct supervisor *(Memorandum at 6-8)*, would have disagreed with the issuance of the Warning.[6]

Ultimately, Plaintiff's claim with respect to the Attendance Warning hinges upon her assertion that other similarly situated employees also exceeded DAP's expectations for personal time off, but did not receive similar written warnings.  Plaintiff points to Mr. Patel, Ms. Huang, Mr. Erickson, Mr. Nwaba and Mr. Nevin in support of this claim.  *(Toulan Aff. at ¶¶ 39-44.)*  The attendance summary which Mr. Nabar received in July 2004, however, reflects that none of these individuals had more than one sick day during the first half of 2004, as compared to Plaintiff's nine and one-half sick days (95.25 hours including appointments).  *(Nabar Aff. (Ex. 2) at ¶ 13 and Ex. A thereto.)*  Plaintiff does not deny that this is the case.  Instead, she relies on the time those individuals missed in the second half of 2004.  The problem for Plaintiff is that those individuals did not miss as much time during the entire year as Plaintiff missed in the first half of the year.[7]

---

[5] On page 18 of her Opposition, Plaintiff seems to suggest that the Attendance Warning is part of her retaliation claim. However, the undisputed evidence demonstrates that her first alleged complaints of discrimination were in response to the Attendance Warning.  *(Memorandum at 12.)*

[6] To the contrary, Mr. Hairston's testimony was clear that associates are warned if they take too many sick days. *(Hairston Dep. (Ex. 11) at 79:2 – 80:13.)*

[7] Plaintiff attached attendance calendars for Mr. Nwaba, Mr. Nevin, and Ms. Huang as Exhibits 6 and 7 to her Affidavit. *(Toulan Aff. at ¶¶ 39 and 44.)*  These records reflect that: Mr. Nwaba had 5.5 sick days in 2004 (4 of which were in the second half of the year) and 6 sick days in 2005; Mr. Nevin took 4 sick days in 2003, 3 sick days in 2004, and 0 sick

The sole exception is Mr. Patel who accumulated approximately five more hours of sick days and appointments combined for the entire year.  Mr. Patel, of course, worked extra hours, including weekends, while Plaintiff stated that she does "not work on the weekends."  *(Memorandum at 26.)* More importantly, Plaintiff completely ignores the fact that other Caucasian American women in the department missed significant amounts of time during the 2004 calendar year, but did not receive any written warning.  *(Memorandum at 26-27.)*  This fact is fatal to Plaintiff's assertion that the Attendance Warning was discriminatory.  Plaintiff fails completely to address this dispositive fact.  Plaintiff also does not address the indisputable fact that the Attendance Warning did not adversely affect her in any way and, therefore, cannot be the basis of a discrimination claim. Accordingly, summary judgment should be awarded to DAP as to this claim.

3.        **Temporary Assignment to the Plant**

As discussed in DAP's Memorandum, Plaintiff also cannot sustain a claim of disparate treatment or retaliation based on her temporary assignment to the Baltimore plant because: (a) she was not injured or harmed in any way by the assignment – her hours, pay, and benefits did not change, she was reimbursed for the increased cost of her commute, and she was publicly lauded for her efforts during the assignment upon her return to the lab; and (b) there is no evidence that the legitimate nondiscriminatory reason for the assignment – a sharp increase in customer complaints involving certain products manufactured at DAP's Baltimore plant – was a pretext for discriminatory or retaliatory intent.  *(Memorandum at 11-12 and 27-28.)*  Plaintiff's Opposition does not respond to these issues and barely even mentions the Baltimore plant assignment.  In fact, Plaintiff's only response is in paragraph 49 of her Affidavit in which she states conclusorily that the transfer substantially changed the terms and conditions of her employment apparently because she

_____

days from June 2005 through May 2006; and Ms. Huang had 3 sick days and 46 hours of appointments (totaling 70 hours) in 2004 and had 2.5 sick days and 53.5 hours of appointments (totaling 73.5 hours) in 2005.  *(See also*

did not have a desk or computer and because she had to remove her personal effects from her cubicle in the Lab during the assignment.  With respect to the desk and computer, Plaintiff's issue is a bit more subtle than she suggests in her Affidavit.  She in fact had both a desk and a computer she could use at the plant, though they were not her own.  *(Toulan Dep. (Ex. 15) at 273:7 – 275:10*).  With respect to her cubicle back in the Lab, Mr. Nabar explained to her that he could not guarantee anyone in the Lab a particular assigned cubicle and thus suggested that she remove her personal items for safekeeping during the assignment.  *(Toulan Dep. (Ex. 15) at 267:9 – 269:19 and Exs. 19 and 20 thereto.)*   Neither of these minor inconveniences changed the terms and conditions of Plaintiff's employment, and Plaintiff does not appear to seriously contend otherwise.   In fact, Plaintiff returned to her position and cubicle when the assignment was over, and was praised for her efforts at the Baltimore plant.  *(Toulan Dep. (Ex. 15) at 270:14-16 and 303:15-21; Memorandum at 12.)*  Accordingly, summary judgment should be granted in favor of DAP on this claim as well.

### 4.    2005 PIP

As with the temporary assignment to the Baltimore plant, Plaintiff's Opposition does not address the legal or factual issues related to the 2005 PIP.  In her Opposition, she claims that Mr. Nabar gave her a negative work performance evaluation despite the positive evaluations of her direct supervisors.  *(Opposition at 26.)*  However, as discussed in the Memorandum, Plaintiff's direct supervisors made negative comments about her performance as well, and there is nothing contradictory about Mr. Nabar's comments.  *(Memorandum at 13-14 and 28-29.)*  In her Affidavit, Plaintiff complains that the PIP made reference to her attendance issues which predated the review period and that Mr. Nabar said that the plant assignment took more time than he thought it should have taken.  *(Toulan Aff. at ¶¶ 52 and 53.)*  However, the Attendance Warning, which related to the entire first half of 2004 (through early July), was issued in late July 2004; and the PIP covered the

---

*Memorandum at 25-26.)*  Plaintiff's Opposition also fails to address the issue of how Ms. Huang, who was a Senior

entire period since her previous PIP which is dated May 9, 2004.  *(Toulan Dep. (Ex. 15) at 178:7-9 and Exhibit 10 thereto; Exhibits 12 and 32 to Toulan Dep. (Ex. 3).)*  Thus, the attendance issues fell squarely within the 2005 review period.  With respect to Plaintiff's disagreement with Mr. Nabar's opinion about her performance, Plaintiff's subjective characterizations and disagreements with comments in a performance evaluation cannot be the basis for an actionable claim of either discrimination or retaliation.  *(Memorandum at 28-30.)*  To the extent Plaintiff desires to rely upon the 2005 PIP as a basis of her claims summary judgment should be granted in favor of DAP.

### 5.  **Insubordination Warning**

The final discrete act discussed in DAP's Memorandum is the warning Plaintiff received as a result of her conduct during her 2005 PIP meeting.  *(Memorandum at 14 and 30-31.)*  Plaintiff does not deny that she engaged in the behavior that resulted in the warning.  Moreover, she does not (because she cannot) identify any other associate that engaged in similarly rude and inappropriate behavior.  Rather, her disagreement with the warning seems to be based upon Ms. Mayor having issued the warning to her despite the fact that Ms. Mayor was not present at the 2005 PIP meeting where the insubordinate behavior took place and on an alleged contradiction between Nabar and Mayor's testimony regarding who was responsible for the discipline.  As with the other alleged contradictions in this matter, Plaintiff attempts to create something that is not there.  Plaintiff's counsel's questions to Mr. Nabar addressed whether he directed Ms. Mayor to issue the disciplinary warning notice; he said he did not.  *(Nabar Dep. (Ex. 10) at 126:14 – 128:7.)*  Ms. Mayor (a Caucasian American woman), on the other hand, testified that she chose to issue the warning to Plaintiff after reading the minutes of the 2005 PIP meeting prepared by Ms. Bennett and after discussing what happened at the meeting with Ms. Bennett and Mr. Nabar, and that Mr. Nabar

---

Chemist and a supervisor, can be considered similarly situated to her and properly used as a comparator.

agreed with her that the discipline was appropriate. *(Mayor Dep. (Ex. 17) at 78:15 – 86:2.)*[8] Ms.

Mayor signed the warning and has been clear that she was the one who issued it. *(Mayor Aff. (Ex.*

*1) at ¶ 19 and Ex. B thereto.)* Mr. Nabar was clear that he agreed with the warning. *(Nabar Dep.*

*(Ex. 10) at 132:15-19.)* Thus, there is no insistency. The fact that Ms. Mayor was not present

herself at the 2005 PIP meeting is similarly immaterial given that she read Ms. Bennett's summary

of the meeting and spoke with Ms. Bennett and Mr. Nabar about it. Ultimately, Plaintiff has simply

failed to identify anything discriminatory or retaliatory about the warning and, therefore, summary

judgment is appropriate on this claim as well.

     **6.**     <u>**New Allegations of Discrimination and/or Retaliation**</u>

     Plaintiff's Opposition identifies, albeit with little or no discussion, additional instances of

alleged discrimination and/or retaliation. Specifically, at the top of page 15 of the Opposition,

Plaintiff alleges that incidents occurred "due to Mayor on … 3/27/06, 4/04/06, 5/8/06, 6/9/06 and

6/29/06." Not only were none of these "incidents" identified in Plaintiff's interrogatory answers

*(Plaintiff's Answer to Interrogatory Nos. 6-12 (Ex. 8))*, Plaintiff's Opposition fails to analyze, much

less discuss, these incidents. However, because there are some passing references to things that

happened on those dates in the Opposition and Plaintiff's Affidavit, Defendant will address those

alleged incidents.

     **a.**     <u>**March 27, 2006.**</u>  Defendant can find no reference to any incident that

occurred on March 27, 2006.

     **b.**     <u>**April 4, 2006.**</u>  On April 4, 2006, Plaintiff was issued another warning as a

result of her continued inappropriate conduct. The warning was issued by Ms. Mayor after Mr.

Patel and Ms. Huang reported to Ms. Mayor that Plaintiff had been photographing them in the Lab

---

[8] Plaintiff makes an almost off-handed comment about Ms. Bennett having shredded her hand-written, short-hand notes of the July 20, 2004 meeting. *(Toulan Aff. at ¶¶ 24 and 29.)* Plaintiff has Ms. Bennett's typed notes of this and all

without their consent and Mr. Patel reported that Plaintiff had threatened to sue him for perjury as a result of his deposition in this matter.  Ms. Mayor believed that this conduct was disruptive and inappropriate.   Ms. Mayor also felt that Plaintiff's interactions with her regarding various attendance issues had become inappropriate as well.   Specifically, in an email to Ms. Mayor regarding her attendance, she sarcastically wrote: "so feel free to use a calculator along with me if you are having trouble following… ."  *(Second Affidavit of Rita Mayor, attached hereto as Exhibit 18, at ¶ 4.)*   Plaintiff's complaint about this warning appears to be that there is insufficient documentation of her threatening other associates with lawsuits.  *(Opposition at 12; Toulan Aff. at ¶¶ 55-57.)*  The fact that there is no documentation of her threat, however, does not mean that it did not happen.   It also does not mean that the discipline was inappropriate, particularly given that Plaintiff does not deny that she was photographing her coworkers or that she threatened a fellow associate with a personal lawsuit.

> c.      **May 8, 2006.**   Plaintiff alleges that on May 8, 2006, she was blocked from accessing the projects of other lab associates in the Product Vision database.   As the Court may recall, this was after Plaintiff downloaded confidential and proprietary DAP information from the database without permission and produced it to her attorney in violation of her Invention and Disclosure Agreement with DAP and this Court's Stipulated Order Regarding Confidentiality of Discovery Material.   The end result was that it took the Court's intervention to get the originals of those documents returned to DAP.   That, however, did not stop Plaintiff from attempting yet again to use the Product Vision database for her own personal purposes.   In late June 2006, it was discovered that Plaintiff was altering Product Vision entries to support challenges she tried to make to comments in her 2006 PIP.  Plaintiff received a written warning regarding this conduct.  *(Mayor Second Aff. (Ex. 18) at ¶ 5 and Ex. B thereto.)*

---

other meetings at issue in this matter.  *(Bennett Dep. (Ex. 16) at 18:7 – 19:6, 31:15 – 32:14, 53:10 – 56:7 and Exs.*

**d.**     **June 9, 2006.**  Plaintiff next complains about the fact that she had to take unpaid leave for her day long absence on May 23, 2006, in order to attend the deposition of Felicia Levine in this matter (which ran a half day).  *(Toulan Aff. at ¶ 61; Levine Dep. (Ex. 12) at 1:12 and 188:20.)*  As the emails attached as Exhibit 12 to Plaintiff's Opposition reflect, Plaintiff was told that absences for her own deposition (which turned out to be a total of three days) would be considered excused based on the fact that Plaintiff was subject to court process for that time, and thus would not count against her fiscal year vacation eligibility and her DAP personal leave time of up to five paid personal days.  She was also told that absences for purposes of attending other depositions and court appearances in this matter would count against her vacation eligibility or paid personal leave time, and that once the combination of paid vacation and paid personal leave time had been exhausted she would be required to take such absences as unpaid personal time off.  By May 23, 2006, Plaintiff had already exhausted her paid vacation and paid personal leave time for the then-current fiscal year and had borrowed two vacation days from the next fiscal year.  *(Mayor Second Aff. (Ex. 18) at ¶¶ 6-7.)*  Thus, Plaintiff was well aware that by choosing to be absent from work in order to attend Ms. Levine's deposition, she would not be paid for that day.

**e.**     **June 29, 2006.**  Finally, Plaintiff complains about being required to obtain prior approval for vacation days.  *(Toulan Aff. at ¶ 62 and Ex. 13 thereto.)*  DAP provides its associates with vacation on a fiscal year basis, i.e., June 1st through May 31st.  *(Mayor Second Aff. (Ex. 18) at ¶ 7.)*  As the email attached to Plaintiff's Opposition reflects, within the first month of the current fiscal year, Plaintiff took five and one-half vacation days (three and one-half of which were not scheduled) and had already exceeded her accrued vacation days for the fiscal year. *(Exhibit 13 to Toulan Aff.)*  DAP's vacation policy, which is quoted in the email and also included in the exhibit, makes it clear that associates are expected to schedule their vacation with the

*2,3,6, and 7 thereto.)*

approval of their managers.  Thus, Plaintiff was being reminded that informing her supervisor of the need to take a vacation day on the very day the vacation day was being taken was not appropriate under rules applicable to everybody else.

**7.       In the Final Analysis, There Is No Evidence of Discriminatory or Retaliatory Intent**

Plaintiff alleges that the unfair and harassing treatment to which she claims she was subjected was motivated by Mr. Nabar's "strong animus against her as a Caucasian female from the United States."  *(Opposition at 19.)*   The evidence of this, according to Plaintiff, is that Felicia Levine and Marsha Uranga, two other Caucasian female U.S. citizens, were both demoted in June 2004.  This opinion too has no basis in fact..

Ms. Levine was hired by Mr. Nabar as Chemist II at an annual salary of $58,008 in December 2001.  Less than half a year later on June 1, 2002, Mr. Nabar promoted her to Senior Chemist I at an annual salary of $63,504.  At that time, Ms. Levine started doing product support work and Mr. Tran and Ms. Cearfoss started reporting to her.  However, in May 2003, Ms. Levine was given a warning for failing to respond to customer complaints in a timely manner.  Thereafter her supervisory responsibilities were removed and she was assigned to report to Mr. Hairston, but still retained her Senior Chemist I title and salary.  *(Second Affidavit of Shree Nabar, attached hereto as Exhibit 19, at ¶ 3; Levine Dep. (Ex. 12) at 21:3-11, 22:2-15, 30:11 – 31:3, 34:11 – 35:8, and Ex. 4 thereto.)*

As part of the Lab reorganization in May 2004, Mr. Nabar decided that all Senior Chemists should have supervisory responsibility.  Since Ms. Levine had not had supervisory responsibility since June 2003 and therefore was no longer functioning as a Senior Chemist, her title was changed to Chemist II and her salary was decreased to $60,000 effective June 1, 2004.  In June 2005, her salary was increased to $61,800, and she was placed on probation for promotion to Senior Chemist (as was Mr. Patel in 2004) and given supervisory responsibility over Ms. Cearfoss.  In January

2006, her supervisory responsibility was suspended until further notice in conjunction with a warning she received for disrespectful conduct towards another associate.   Ms. Levine resigned from DAP in February 2006.  *(Nabar Second Aff. (Ex. 19) at ¶ 4; Levine Dep. (Ex. 12) at 37:1 – 38:4, 41:10 – 43:1, and 44:18 – 45:12.)*

Ms. Uranga was hired by Mr. Nabar in September 2002 as a Senior Chemist I at an annual salary of $55,008.  During her first almost two years with DAP, Ms. Uranga focused on one new product development project.  Prior to the 2004 reorganization of the Lab, at Ms. Uranga's request, Mr. Nabar agreed to move her to product support, and she was assigned to work for Mr. Hairston in the reorganization.   However, because she did not then have (and never had any) supervisory responsibility, her title was changed to Chemist II effective June 1, 2004, but her salary was not affected.[9]  In June 2005, Ms. Uranga received an increase in salary to $56,832.  In July 2005, Ms. Uranga transferred to the Quality Improvement Engineer at position at the Baltimore plant at an annual salary of $57,972.  *(Nabar Second Aff. (Ex. 12 ) at ¶ 5; Uranga Dep. (Ex. 13) at 5:17 – 6:4, 6:15-18, 8:2-4, 11:15 – 12:20, 14:14 – 15:3, 16:9 – 17:3, 17:10-11, and 82:14 – 85:15.)*

Thus, Mr. Nabar is responsible for hiring Ms. Levine and Ms. Uranga, as well as Plaintiff. In addition, Mr. Nabar is also responsible for hiring Ms. Cearfoss and Ms. Mihalcik.  In fact, 5 of the 14 individuals he has hired while at DAP were Caucasian American women.  *(Memorandum at 15.)*  Plaintiff fails to address the legal conclusion that these facts create a strong presumption that Mr. Nabar was not motivated by a discriminatory intent.  *(Memorandum at 23-24 and cases cited therein.)*   Plaintiff also wants to ignore the facts that Mr. Nabar was responsible not only for promoting Plaintiff and Ms. Levine, but also for promoting Ms. Cearfoss, Ms. Monette and Ms.

---

[9] Personnel changes for Lab associates such as promotions, demotions and salary changes are generally effective June 1st, in conjunction with DAP fiscal year.  *(Mayor Second Aff. (Ex. 18) at ¶ 3.)*

Benjamin. *(Mayor Second Aff. (Ex. 18) at ¶¶ 9-11.)*[10]  He also gave Ms. Levine a second chance at a promotion after she was demoted initially.  Moreover, even when Ms. Levine and Ms. Uranga were Chemist IIs (and both were, like Plaintiff, doing product support work), their salaries were higher than all of the other Chemist IIs, including Mr. Patel.  *(Memorandum at 15 citing Mayor Aff. (Ex. 1) at ¶¶ 8-16.)*[11]  All of these facts dispel any notion that Mr. Nabar discriminated against Cauasian American women.

Plaintiff also relies upon the collective conclusion of herself, Ms. Uranga,[12] and Ms. Levine that Mr. Nabar discriminated against them.[13]  It is well established that such conclusions are not a sufficient basis upon which to sustain a claim.  See Strag v. Board of Trustees, 55 F.3d 943, 950 n.1 (4th Cir. 1995) ("two plaintiffs cannot "bootstrap" themselves past summary judgment simply by asserting that they have both made the same claims against the same employer").[14]

Plaintiff also asserts that "any reasonable employee in Toulan's stead would surely be dissuaded from continuing to challenge unfair and unlawful treatment at DAP."  The purported evidence of this is the fact that Ms. Uranga and Ms. Levine have not filed EEOC lawsuits as of yet.  *(Opposition at 17.)*  This theory, however, does not withstand scrutiny for a number of reasons.

---

[10] On page 24 of her Opposition, Plaintiff seems to claim that Mr. Patel and Ms. Huang were the only associates who received promotions.  This assertion requires little response as it is clearly established that Plaintiff was also promoted by Mr. Nabar, as were the Caucasian American women identified supra.

[11] Ms. Levine and Ms. Uranga testified that there are differences in their education and experience as compared to Plaintiff that would justify their higher salaries.  *(Uranga Dep. (Ex. 13) at 87:6 – 88:15; Levine Dep. (Ex. 12) at 106:1 – 107:6.)*

[12] Ms. Uranga's testimony on the subject is instructive.  Ms. Uranga explained that the sole reason for her conclusion that her demotion was discriminatory is that fact that Ms. Levine was demoted at the same time and that Plaintiff received a warning and a disciplinary action.  She said that if she had been the only one demoted, she would not have thought it was discriminatory.  *(Uranga Dep. (Ex. 13) at 79:14-21.)*  Ms. Uranga also admitted that she does not know the reason why Ms. Levine was demoted.  *(Uranga Dep. (Ex. 13) at 82:11-13.)*

[13] Plaintiff's attempt to rely upon the allegation that Linda Benjamin felt she had no choice but to resign in 2001 is similarly inadequate.  Moreover, there is no evidence that Ms. Benjamin's reasons for resigning were related to a belief that she was being discriminated against.  Neither Plaintiff, Ms. Levine, nor Ms. Uranga ever met or spoke with Ms. Benjamin who resigned before any of them were hired by DAP, and thus the entire basis for their allegations related to Ms. Benjamin is an email exchanged between Ms. Uranga and Ms. Benjamin.  *(Toulan Dep. (Ex. 15) at 26:11-21; Levine Dep. (Ex. 12) at 18:21 – 19:8; Uranga Dep. (Ex. 13) at 46:17 – 50:3 and Exhibit 2 thereto; Mayor Second Aff. at ¶ 9.)*  The email, however, does not say that Ms. Benjamin felt forced out.  *(Ex. 2 to Uranga Dep. (Ex. 13).)*

First, Ms. Uranga and Ms. Levine both engaged in protected activity by submitting affidavits to the EEOC in support of Plaintiff's Charge and by testifying on her behalf in this lawsuit.  Second, neither indicated in either forum that they had been dissuaded from filing a charge due to fear of reprisal.  In fact, Ms. Uranga testified that she considered filing an action but decided that her energy and resources would be better put to finding a position outside of the lab.  *(Uranga Dep. (Ex. 13) at 77:11-14.)*  Third, given that Ms. Levine is no longer employed by DAP, there is no reason for her to fear reprisal.

Ultimately, Plaintiff's argument with respect to retaliation is clearly predicated upon nothing more than her belief that once she complained about something she perceived to be discriminatory, she could not be disciplined regardless of her conduct.  This clearly is not the law.  Chappell v. School Board of the City of Virginia Beach, 12 F. Supp. 2d 509, 517 (E.D. Va. 1998); Pulley v. KPMG Consulting, Inc., 348 F. Supp. 2d 388, 397 (D. Md. 2004).

### D.      Plaintiff's Equal Pay Act/Discriminatory Wage Payment Claim is Without Merit

As explained in DAP's Memorandum, it is Plaintiff's burden to establish that the work she performed was substantially equal to Mr. Patel's, the only individual to whom she seeks to compare herself.  *(Memorandum at 33-35.)*  Plaintiff's Opposition fails to create any dispute as to the differences between the work she did and the work Mr. Patel did.  To the contrary, Plaintiff's contentions further confirm that Mr. Patel's and Plaintiff work was different.

As discussed in Defendant's Memorandum, there were significant differences in the work that Plaintiff and Mr. Patel were performing.  Plaintiff was working primarily with latex sealants; Mr. Patel was working primarily in reactive chemistries.  Plaintiff was doing primarily product support for DAP's existing products; Mr. Patel was doing primarily research.  Plaintiff had no

---

[14] It is worth noting that the only deposition that Plaintiff did not attach in full to her Opposition is Mr. Hairston's deposition in which he testified that Mr. Nabar treats everyone in the Lab the same way.  *(Hairston Dep. (Ex. 11) at 8:21 – 9:17, 16:8 – 17:20; 19:10 – 20:12, and 145:16 – 148:7.)*

supervisory responsibility; Mr. Patel had supervisory responsibility as well as lead responsibility on major initiatives. *(Memorandum at 16.)* Plaintiff's Opposition does not dispute any of these facts. Instead, she argues: (1) that she and Mr. Patel worked on the same projects; (2) that her work resulted in 60% of the gross profits and sales for the Company; and (3) that she worked on more projects than Mr. Patel. As explained, these arguments do not further her position.

First, Plaintiff claims that she and Mr. Patel worked on the same project for DAP in 2003-2004 citing Exhibits J and K to her Opposition. *(Opposition at 20.)* Those documents reflect that she and Mr. Patel were both working on projects for a particular client of DAP.[15] The reports attached as Exhibits J and K, however, confirm Mr. Nabar's testimony that Plaintiff and Mr. Patel worked on different aspects of the project. Specifically, Plaintiff worked on a latex version (Exhibit J) and Mr. Patel worked on a reactive chemistry based MS (modified silicone) polymer version (Exhibit K). *(Nabar Dep. (Ex. 10) at 215:7 – 218:7.)*

Plaintiff's reliance on the number of projects she worked on as compared to Mr. Patel, citing Exhibits 9 and 11 to her Affidavit, is similarly unavailing. *(Opposition at 25.)* The number of projects each individual completed or even worked on in the absence of other information about those projects reveals next to nothing about the amount or type of work. In fact, the differences in the fundamental nature of Mr. Patel's research and Plaintiff's product support work affect the number of projects that each associate can complete. *(Nabar Second Aff. (Ex. 19) at ¶¶ 6-7.)* Moreover, the project lists attached as Exhibits 9 and 11 to Plaintiff's Affidavit reflect clearly that Plaintiff and Mr. Patel worked on different projects.

Plaintiff's final effort is her claim that "her work product resulted in about 60% of the gross profits and sales for the company." *(Opposition at 24.)*[16] This ridiculous claim is not even

---

[15] The name of this client is covered by the Stipulated Order Regarding Confidentially of Discovery Material.

[16] This argument really goes to a sort of comparable worth analysis which is not the purpose of the EPA. <u>Bartges v. The University of North Carolina at Charlotte</u>, 908 F. Supp. 1312, 1324 (W. D. N. C. 1995) and cases cited therein.

supported by Plaintiff's Affidavit or any admissible evidence.   In paragraph 17 of her Affidavit, Plaintiff claims that the "Gross Product Sales (GPS)" shows that the products for which she did product support account for 88% of DAP's business and the products which Mr. Patel is working to develop account for less than 2% of DAP's business.   Even if this were true, this assertion once again confirms the fact that Plaintiff and Mr. Patel were doing different work.[17]

Thus, all Plaintiff has left to support her assertion that she and Mr. Patel did equal work are her repeated conclusory assertions *(Plaintiff's Aff.   at ¶ 3, ¶ 7, ¶ 10, ¶ 12, and ¶ 40)* and perhaps most tellingly the fact that she and Mr. Patel had the same title for a period of time.[18]   As discussed above, the undisputed evidence in this matter, by contrast, establishes that Mr. Patel and Plaintiff had completely different job functions, requiring different skill levels.

It is well established that the equal work analysis is not dependent on job titles, but rather on actual job requirements and performance.   29 C.F.R. §1620.13(e) ("job titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard").   That said, the larger problem for Plaintiff with this theory, of course, is that if the Court were to accept the proposition that all individuals with the same title were performing equal work, Plaintiff's discriminatory wage claims would necessarily fail because at all times, there have been male associates in the lab with the same title as Plaintiff who were paid less than was she.   As explained in DAP's Memorandum, during the period Plaintiff was a Chemist I, there were two male Chemist I's who were paid less than she was.   Since Plaintiff was promoted to Chemist II, there has

---

[17] Moreover the Court will recollect that after the close of discovery Plaintiff sought production of "GPS data."   (DAP believes that what Plaintiff is referring to is sales information which DAP accesses through a software program called Graphical Performance Series.)   The Court, however, denied Plaintiff's request.   Plaintiff's attempt to use this information without even knowing what it is called, much less what it truly reflects, is completely inappropriate.

[18] Plaintiff also seems to rely on the offer letters that are sent to associates and notes that none of them say reactive chemistry is required.   While Mr. Nabar did testify that none of the offer letters were specific as relates to reactive chemistry *(Nabar Dep. (Ex. 10) at 62:14 – 63:18)*, Plaintiff is incorrect in her assertion that the letters show that all associates had the same key functions.   In fact, Mr. Patel's and Plaintiff's offer letters, like all of the other evidence upon which Plaintiff seeks to rely, describe different initial responsibilities.   *(Mayor Second Aff. (Ex. 18) at ¶ 8 and Exs.*

always been a male associate who has been paid less than Plaintiff.  *(Memorandum at 15.)*  The supplemental Exhibit submitted by Plaintiff this week confirms that as of June 2006 this continues to be the case.  *(Docket No. 57.)*  Plaintiff's insistence on relying on one among a larger group of comparators is inappropriate in these circumstances is not sufficient to establish a prima facie violation of the EPA.[19]  *(Memorandum at 34.)*  Similarly, the fact that there has always been a male associate with the same job title as Plaintiff who was paid less, as well as the fact that from June 2004 through February 2006 the highest paid individuals in the same job title as Plaintiff were Caucasian American women *(Memorandum at 15 and Ex. 1 thereto at ¶¶ 8-16)*, defeats Plaintiff's wage discrimination claim under Title VII, even assuming she could establish a prima facie case.  See Reece v. Martin Marietta Technologies, Inc., 914 F. Supp. 1236, 1240-41 (D. Md. 1995) (discussing the differences between the discrimination provisions of the EPA and Title VII and noting that under Title VII, the plaintiff has the burden of proving intentional discrimination).

Finally, it remains undisputed that there were significant differences between Plaintiff's and Mr. Patel's educational background: Plaintiff's two-year degree in chemical technology from Catonsville Community College versus Mr. Patel's four-year degree in chemistry from the University of Memphis.  It remains undisputed as well that Mr. Patel assumed supervisory responsibility starting in September 2003 and Plaintiff has never had supervisory responsibility.  It also remains undisputed that while Mr. Patel had experience in sealants and chemistry relative to DAP's products before being hired by DAP, Plaintiff had no prior experience in the types of products that DAP manufactures.  *(Memorandum at 4 and 15-16.)*  The fact that Plaintiff may have

---

*C and D thereto.)*  Moreover, the fact that an offer letter did not state a requirement of a background in reactive chemistry does not mean that Mr. Nabar was not looking for it or that he did not think it would be valuable for his lab.

[19] Plaintiff's own statements demonstrate this fallacy.  On page 4 of her Opposition Plaintiff states that Mr. Nwaba and Mr. Nevin were "male Chemist II counterparts to [her] in 2004."  In paragraph 3 of her Affidavit Plaintiff asserts (in direct contradiction to a wealth of undisputed evidence) that all Chemist I and Chemist IIs "essentially perform the same duties."

had more <u>years</u> of working experience than Mr. Patel is irrelevant.  Accordingly, Plaintiff's wage discrimination claims are without merit.

**E.      Plaintiff's Other Allegations In Her Opposition**

Plaintiff makes a number of other assertions in her Opposition that are all without merit and warrant only brief comment.

Plaintiff claims that she took an $8,000.00 per year pay cut by coming to DAP.  *(Toulan Aff. at ¶4 and Opposition at 23.)*  This claim is both irrelevant and ignores the fact that when she was applying for a job at DAP she was unemployed because she had been laid off from her previous job. *(Toulan Dep. (Ex. 15) at 53:8-13; Mayor Second Aff. (Ex. 18) at ¶ 8 and Ex. E thereto.)*  Plaintiff claims that Mr. Nabar promised to bring her back up to the salary she earned at her former employer.  *(Toulan Aff. at ¶4.)*  On this issue, Plaintiff testified that during her interview with Mr. Nabar he promised that she would receive a six-month salary review where her salary could be raised up to $45,000.00 if she came up the learning curve.  *(Toulan Dep. (Ex. 15) at 57:17-58:3.)*  There is, of course, no misrepresentation claim in this matter.  Moreover, Plaintiff's offer letter reflects a promise that her salary be reviewed in October 2002, six months after her hiring, at which point she received a salary increase to $45,000.00, exactly what was promised.  *(Toulan Dep. (Ex. 15) at 62:13 – 64:11 and 102:16 – 103:10 and Ex. 5 thereto.)*[20]  Plaintiff claims that Ms. Levine was also promised that she would be back to her previous earnings.  In fact, Ms. Levine testified that Mr. Nabar told her that after a year, she "should be back close" to what she was making at her previous employer.  *(Levine Dep. (Ex. 12) at 72:14 – 73:8.)*  Within one-half year of being at DAP, Ms. Levine received a 9.5% raise.  *(Mayor Aff. (Ex. 1) at ¶ 15.)*

---

[20] Plaintiff states that that when she was hired, Mr. Nabar did not mention to her the possibility of bonuses or a probationary period prior to promotion. *(Toulan Aff. at ¶ 3.)*  Mr. Nabar, however, testified that he does not discuss the potential of discretionary bonuses with individuals when he is hiring them.  *(Nabar Dep. (Ex. 10) at 149:6 – 150:4.)* Mr. Patel similarly testified that Mr. Nabar did not talk with him about the potential of bonuses or a probation period prior to promotion at the time of hire.  *(Patel Dep. (Ex. 14) at 26:1 – 27:16.)*   Interestingly, Plaintiff admits this at page 8 of her Opposition.

Plaintiff, on a number of occasions, alleges Mr. Patel and Ms. Huang were singled out for bonuses and raises.  *(E.g. Opposition at 15, 22 and 24.)*  First, as the documents produced reflect, from June 2002 through June 2006, the following associates in the Lab received discretionary bonuses: Mr. Cahoon; Mr. Erickson; Mr. Hairston; Ms. Huang; Mr. Junker; Mr. Patel; Mr. Van Horn; and Mr. Nevin.  *(Mayor Second Aff. (Ex. 18) at ¶ 12; Nabar Dep. (Ex. 3) at 168:14-170:14.)*  Moreover, Ms. Huang's bonuses have been consistent with the other Senior Chemists in the Lab.  *(Mayor Second Aff. (Ex. 18) at ¶ 12.)*  In addition, every associate in the Lab has received raises almost every year.  *(Mayor Second Aff. (Ex. 18) at ¶ 16.)*  Moreover, while Plaintiff does not define what she means by substantial raises, it is worth noting that from the time Ms. Huang has been employed by DAP, Ms. Monette and Ms. Cearfoss have received greater overall percentage increases in salary than Ms. Huang.  *(Mayor Second Aff. (Ex. 18) at ¶ 13.)*

Plaintiff complains about the fact that Ms. Huang[21] was not disciplined for her alleged safety violations.  *(Opposition at 10; Toulan Aff. at ¶ 18.)*  When questioned about the reason Ms. Huang was not disciplined for the alleged safety violations, Mr. Nabar explained that safety matters in the Lab are handled by the safety committee.  *(Nabar Dep. (Ex. 10) at 122:3 – 123:13.)*  To the extent that Plaintiff is attempting to rely upon this argument to establish that warnings she received for her inappropriate behavior were discriminatory, Plaintiff's reliance upon Ms. Huang's alleged safety violations is misplaced because in order to make out a prima facie case of disparate discipline Plaintiff must establish that the others were not similarly disciplined for like conduct.  Erskine v. Bd. of Educ., 197 F. Supp. 2d 399, 406 (D. Md. 2002).  As discussed in DAP's Memorandum and not rebutted by Plaintiff, there are no other employees who engaged in insubordinate and inappropriate behavior similar to Plaintiff.  On the other hand, Ms. Uranga admitted in her

---

[21] Plaintiff alleges that Ms. Huang is not an American citizen.  *(Toulan Aff. at ¶ 18.)*  Ms. Huang became a U.S. citizen in 2001.  *(Affidavit of Lan Huang, attached hereto as Exhibit 20, at ¶ 3.)*

deposition that she was involved in an incident that was considered a safety violation, but she was not disciplined.  *(Uranga Dep. (Ex. 13) at 43:12-16; Nabar Second Aff. (Ex. 19) at ¶ 5.)*

Plaintiff asserts on a number of occasions that only Caucasian American females were demoted by Mr. Nabar.  *(Opposition at 11.)*  As Plaintiff is aware through discovery, two other individuals were demoted by Mr. Nabar: Juan Arango (Black male) and Dave Carberry (Caucasian male)  In addition, in various years, Mr. Carberry did not receive a salary increase and Mr. Arango's salary was decreased.  *(Mayor Second Aff. (Ex. 18) at ¶¶ 14-15.)*

Finally, Plaintiff asserts at the bottom of page 9 that she complained about not receiving equal pay for equal work with her supervisors including Mr. Nabar and Mr. Hairston.  The portion of Mr. Hairston's deposition which Plaintiff cites for this proposition simply does not support it.  To the contrary, what Mr. Hairston made clear was that Plaintiff complained about her salary vis-à-vis what she was making at her previous employer, not her salary in comparison to her fellow employees at DAP.  It also says nothing about any complaints to Mr. Nabar.  *(Hairston Dep. (Ex. 11) at 118:13-121:3.)*

Though none of the above facts are material for purposes of summary judgment they do reflect upon the lack of care with which Plaintiff's Opposition was written, which in turn reflects upon the merits of Plaintiff's claims.  See <u>Bryan v. Lucent Technologies, Inc.</u>, 307 F. Supp. 2d 726, 729-30 (D. Md. 2004).

### III.   <u>CONCLUSION</u>

For the reasons set forth above, as well as those discussed in its Motion, DAP's Motion for Summary Judgment should be granted.  Judgment should be entered in favor of DAP and against Plaintiff in this matter.

Respectfully submitted,


_____/s/_____
Douglas M. Topolski (Fed. Bar #07844)
Elena D. Marcuss (Fed. Bar #25547)
McGuireWoods LLP
7 St. Paul Street, Suite 1000
Baltimore, Maryland  21202
(410) 659-4400

Attorneys for Defendant DAP Products Inc.

**APPENDIX OF EXHIBITS**

| <u>Ex. No.</u> | <u>Description</u> |
|---|---|
| 10 | Select Portions of the Deposition of Shree Nabar |
| 11 | Select Portions of the Deposition of Thomas Hairston |
| 12 | Select Portions of the Deposition of Felicia Levine |
| 13 | Select Portions of the Deposition of Marcia Blais (Uranga) |
| 14 | Select Portions of the Deposition of Jay Patel |
| 15 | Select Portions of the Deposition of Plaintiff |
| 16 | Select Portions of the Deposition of Linda Bennett |
| 17 | Select Portions of the Deposition of Rita Mayor |
| 18 | Second Affidavit of Rita Mayor |
| 19 | Second Affidavit of Shree Nabar |
| 20 | Affidavit of Lan Huang |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of August 2006, a copy of Defendant's Reply to

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and

Memorandum of Law in Support and all of its Exhibits were mailed, first class, postage prepaid to:

>Jeffery Taylor, Esquire
>Michael J. Snider, Esquire
>Ari Taragin, Esquire
>Snider & Associates, LLC
>104 Church Lane, Suite 201
>Baltimore, Maryland 21208
>Attorneys for Plaintiff


_____/s/_____
Elena D. Marcuss

#4110421.2